IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| WEST COAST MANAGEMENT & CAPITAL, LLC, Derivatively, on behalf of Nominal Defendant CARRIER ACCESS CORPORATION | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. |
| v. | ) ) | |
| ROGER L. KOENIG, TIMOTHY R. ANDERSON, NANCY PIERCE, JOHN W. BARNETT, JR., DAVID R. LAUBE, MARK FLOYD, THOMAS C. LAMMING, KELD, LLC, and LANCE W. LORD, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| And | ) ) | |
| CARRIER ACCESS CORP., | ) ) | JURY TRIAL DEMANDED |
| Nominal Defendant. | ) | |

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff West Coast Management & Capital, LLC ("Plaintiff"), derivatively and on

behalf of Nominal Defendant Carrier Access Corporation, files this Verified Shareholder

Derivative Complaint and alleges, upon information and belief, except as to those allegations that pertain to Plaintiff, which are alleged on personal knowledge, as follows:

## I.   NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff, a shareholder of Carrier Access Corporation ("Carrier Access" or the "Company"), against certain current or former officers and directors of Carrier Access seeking to remedy the Individual Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred from October 21, 2003 through May 20, 2005 (the "Relevant Period") and have caused substantial losses to Carrier Access.

2.    Nominal Defendant Carrier Access designs, manufactures and sells converged access equipment to wireline and wireless carriers. The Company's products are used to upgrade capacity and provide enhanced services to wireline and wireless communications networks. Its products support traditional telecommunications technologies, as well as technologies, such as voice-over Internet protocol ("VoIP") and fiber-based access, which is referred to as a passive optical network ("PON"). The Company's product portfolio features eight platforms that reside in a variety of locations, including Carrier Access' central office, cell site and wireless hub locations, and the end user's business premises.

3.    Throughout the Relevant Period, the Individual Defendants issued numerous positive press release and statements and filed quarterly reports with the SEC that described the Company's financial performance.   These statements were

materially false and misleading because they failed to disclose and misrepresented, *inter alia*, that Defendants had engaged in improper accounting practices. Defendants have already admitted that Carrier's publicly announced year-end 2003 and 2004 financial statements were materially false and misleading. In addition, Defendants have also admitted that all eight quarterly financial statements reported to the investing public for the years 2003 and 2004 were materially false and misleading. As a result of this financial misreporting, Carrier has restated all of its publicly issued financial statements issued for FY2003 and FY2004. The financial restatements are enormous. Defendants' failure to comply with Generally Accepted Accounting Principles ("GAAP") caused, for example: a) FY2003 net income and Earnings Per Share ("EPS") to be overstated by 62.6% and 66.7%, respectively; b) 2Q04 net income and EPS to be overstated by 23.7% and 22.2%, respectively; c) 4Q04 net income and EPS to be overstated by 59.6% and 63.6%, respectively; and d) FY2004 net income and EPS by 150.5% and 160.0% respectively. Significantly, while Defendants reported that FY2004 was profitable with positive EPS, the restated results admit that the Company had actually lost $1.8 million and its EPS lost $0.05 for the year. The Company's restatement also disclosed that Carrier had material weaknesses and management circumvented and failed to establish required accounting controls so that its financial statement complied with GAAP. Carrier's overstated financial results in FY2003 and FY2004 caused the market to believe that Carrier was a much more financially successful and profitable company than it actually was and, as a result, the Company's share price was artificially inflated throughout the Relevant Period.

4.      The Individual Defendants took full advantage of the artificial inflation in Carrier's stock price during the Relevant Period and unloaded over 730,000 shares of their own personal Carrier stock, reaping over $8.7 million in unlawful insider trading proceeds.   While the Individual Defendants were selling their personal holdings in Carrier common stock, they were simultaneously issuing materially false and misleading financial statements.   This, of course, allowed the Individual Defendants to unload their stock on the unsuspecting investing public at prices much higher than if the true financial condition was known to the market.   The Individual Defendants' stock sales coincided with peaks in Carriers' sock price as a result of the fraud.   The average trading price for Carrier stock in the 90 days after Defendants' fraud was revealed- May 20, 2005 to August 19, 2005- was only $5.16 per share.   In contrast, the Individual Defendants unloaded their stock at prices as high as $17.75.   The average trading price of the Individual Defendants' illegal insider sales was $12.03, 133% higher than the average trading price of Carrier stock after the fraud was revealed.

5.      On May 20, 2005, the Company issued a press release providing updates of its previously announced and ongoing financial review.   The press release announced that it had determined that the Company had recorded certain revenues and direct costs and that the amounts were significant.   Following this news, shares of the Company's securities fell $0.69 per share, almost 13% to close at $4.61 per share, on unusually heavy trading volume.   Numerous securities class action lawsuits against the Company followed.   Also, the SEC is conducting an internal investigation into the Company's conduct.

6.      Subsequently on August 2, 2005, the Company announced that it had restated its financial statements for the years 2003 and 2004.  The Company attributed the improper accounting practices that necessitated the restatement to a lack of effective internal financial controls.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

8.      Also, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331(a)(2) as a federal question exists.

9.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Carrier Access maintains its corporate headquarters in this district.  Further, Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

### III.   PARTIES

11.     Plaintiff West Coast Management & Capital, LLC, is a limited liability company organized under the laws of the State of Washington.  Plaintiff is and was at all relevant times, a shareholder of Nominal Defendant Carrier Access.

12.     Nominal Defendant Carrier Access is a Delaware corporation with its principal place of business located in Colorado.  Carrier Access designs, manufactures, and sells converged access equipment to wireline and wireless carriers.   The Company's products are used to upgrade capacity and provide enhanced services to wireline and wireless communications networks. Its products support traditional telecommunications technologies, as well as technologies, such as VoIP and fiber-based access. The Company's product portfolio features eight platforms that reside in a variety of locations, including Carrier Access's central office, cell site and wireless hub locations, and the end user's business premises.

13.     Defendant Roger Koening ("Koening") is a citizen and resident of the State of Colorado.  Koening, a founder of the Company, has served as Carrier Access' President, Chief Executive Officer and Chairman of its Board of Directors since its formation in 1992.  As part of the duties of his senior positions at Carrier, Koenig was responsible for directing the Company's finances and business affairs.   As the Chairman of Carrier's Board of Directors, Koenig was required to not only keep himself informed of the Company's day-to-day business and finances, but also to keep Carrier's non-management directors apprised of the state of Carrier's business and finances, including the revenue and growth figures and the outlook for the Company's wireless

business – Carrier's primary revenue source.   During the Relevant Period, Koenig participated in the issuance of false and misleading statements and failed to disclose material information about Carrier's business, accounting and financial status and outlook.   During the Relevant Period, while in possession of material, undisclosed information about Carrier's false financial statements, Koenig sold 280,500 shares of his Carrier stock for insider trading proceeds of more than $3.5 million.

14.     Defendant Nancy G. Pierce ("Pierce") is a citizen and resident of the State of Colorado.   Pierce, a co-founder of the Company, has served as Carrier Access' Corporate Development Officer since April 2000.   Pierce served as the Company's Interim Chief Financial Officer from November 2004 through June 2005 after Defendant Anderson resigned as Chief Financial Officer on November 18, 2004.   Pierce has also served as the Company's Secretary and a member of its Board of Directors since its formation in 1992.   Pierce held previous positions of Corporate Controller, Chief Financial Officer, Vice President – Finance and Administration and Treasurer with the Company.   As part of the duties of her senior positions at Carrier, Pierce was responsible for directing the Company's finances and business affairs.   As a member of Carrier's Board of Directors, Pierce was required to keep herself informed of the Company's day-to-day business and finances, including the revenue and growth figures and the outlook for the Company's wireless business- Carrier's primary revenue source. During the Relevant Period, Pierce participated in the issuance of false and misleading statements and failed to disclose material information about Carrier's business, accounting and financial status and outlook.   During the Relevant Period, while in the

possession of material, undisclosed information about Carrier's false financial statements, Pierce sole 280,500 shares of her Carrier stock for insider trading proceeds of more than $3.5 million.

15.     Koenig and his wife, Pierce, are the managing members of Keld LLC ("Keld") and they have shared voting power over the Company's shares held in Keld. During the Relevant Period, Koening and Pierce, through Keld, sold 561,000 Carrier Access shares for insider trading proceeds of more than $7 million.

16.     Defendant Timothy R. Anderson ("Anderson") is a citizen and resident of the State of Alabama.  Anderson was Carrier Access' Chief Financial Officer and Vice President of Finance Administration of the Company until his resignation on November 18, 2004. Anderson resigned as CFO for Carrier as a result of this concern with the improper recognition of revenue associated with the 4Q04 Verizon Wireless transaction and the myriad of additional undisclosed GAAP violations that had been occurring at Carrier during FY2003 and FY2004.  Shortly after his resignation, Anderson filed a lawsuit against Defendants Koenig and Pierce charging that prior to his November 18, 2004 resignation, he personally informed Koenig that the 4Q04 $4.0 million Verizon Wireless transaction should not be recognized as revenue by Carrier under GAAP. During the Relevant Period, Anderson participated in the issuance of false and misleading statements and failed to disclose material information about Carrier's business, accounting and financial status and outlook.  While in the possession of material, undisclosed information about Carrier's false financial statements, Anderson

sold 167,819 Carrier Access shares for insider trading proceeds of more than $1.7 million.

17.     Defendant David R. Laube ("Laube") is a citizen and resident of the State of Colorado.  Laube has served as a member of the Board of Directors of the Company since January 2001.

18.     Defendant Mark A. Floyd ("Floyd") is a resident of the State of Texas. Floyd has served as a member of the Board of Directors of the Company since June 2001.

19.     Defendant Thomas C. Lamming ("Lamming") is a citizen and resident of the State of Colorado.  Lamming has served as a member of the Board of Directors of the Company since April 2, 2004.

20.     John W. Barnett, Jr. ("Barnett") is not a resident of the state of Washington and is believed to be a citizen and resident of the State of North Carolina.  Barnett has served on the Company's Board of Directors since December 1998.

21.     Defendant General Lance W. Lord ("Lord"), upon information and belief, is a resident of Colorado.  Lord was appointed to the Board of Directors on July 14, 2006. Lord also serves on the Company's Compensation and Nominating and Corporate Governance Committees.

22.     Defendant Keld, LLC ("Keld") is, and at all relevant times was, a shareholder of Carrier Access.  Defendants Koenig and Pierce are managing members of Keld and have shared voting and investment power over the shares held by Keld. During the Relevant Period Keld, through Defendants Koenig and Pierce, sold 561,000

Carrier Access shares for proceeds of over $7 million.  Keld is a Colorado limited liability

company with its principal place of business located in Colorado.

23.     Defendants Koening, Pierce, Anderson, Laube, Floyd, Barnett, Lord and

Lamming are collectively referred to herein as the "Individual Defendants."  Defendants

Koening, Pierce, Laube, Floyd, Lord, Barnett and Lamming are collectively referred to

herein as the "Director Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company

and because of their ability to control the business and corporate affairs of the

Company, the Individual Defendants owed the Company and its shareholders the

fiduciary obligations of good faith, trust, loyalty, and due care.  Each director and officer

of the Company owed to the Company and its shareholders the fiduciary duty to

exercise good faith and diligence in the administration of the affairs of the Company.  In

addition, the Defendants owed a duty to the Company and its shareholders to

implement adequate internal controls and procedures to reasonably assure that the

financial condition and business prospects of the Company were reported truthfully and

accurately, that the Company complied with all applicable state and federal laws and

that the Company's financial statements were prepared and presented in accordance

with Generally Accepted Accounting Principles ("GAAP").  As set forth below the

Individual Defendants violated these duties and abdicated their oversight responsibilities

to the Company.  As a result, the Company has been named as a defendant in and

exposed to millions of dollars of liability from securities class action lawsuits and has

incurred and will continue to incur legal, accounting and other expenses.  As a further result, the Company is the subject of an informal Securities and Exchange Commission ("SEC") investigation.  In addition, Defendant Anderson and Director Defendants Koenig and Pierce have reaped millions of dollars in illicit insider trading profits.

25.     As further alleged herein, Carrier Access' current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company and shareholders by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to implement internal accounting controls sufficient to reasonably assure that the Company's financial statements were prepared and presented in accordance with GAAP and failure to oversee the Company's compliance with legally mandated disclosure standards and systemic failure to assure that a reasonable information and reporting system existed, and/or (2) are not independent from members of Carrier Access' Board of Directors who face a substantial likelihood of liability.

## V.     SUBSTANTIVE ALLEGATIONS

26.     On October 21, 2003, the Company issued a press release entitled "Carrier Access Reports Third Quarter 2003 Financial Results; Revenues Grow 31% Sequentially; Company Achieves Third Consecutive Quarterly Profit." The press release stated in part:

Carrier Access Corporation, a leading provider of broadband access solutions, today reported its financial results for the third quarter ended September 30, 2003.

Revenues for the third quarter of fiscal 2003 were $15.9 million compared with $12.2 million for the second quarter of fiscal 2003 and $10.5 million for the third quarter of fiscal 2002. Net income for the third quarter of fiscal 2003 was $702,000 or $0.03 per diluted share compared with a net income for the second quarter of fiscal 2003 of $122,000 or $0.00 per diluted share and a net loss of $14.9 million or $0.60 per diluted share for the third quarter of fiscal 2002.

Revenues for the first nine months of fiscal 2003 were $39.3 million compared with $38.8 million in the same period last year. Net income for the first nine months of fiscal 2003 was $941,000 or $0.04 per diluted share compared with a net loss for the first nine months of fiscal 2002 of $44.6 million or $1.80 per diluted share. During the first nine months of 2003, the company recovered significant amounts of aged receivables, and accordingly changed its estimates for allowance for doubtful accounts.

*"This was a great quarter for Carrier Access, our third consecutive quarter of revenue and net income growth," said Roger Koening, president and CEO, Carrier Access Corporation. "We are clearly executing our plan to return to profitability and to increase our revenue through diversification of our customer base with the introduction of new products. Our third-quarter results demonstrate our progress as revenues grew 31% sequentially to $15.9 million, reflecting increased market demand for our wireless, integrated business services, Voice over IP (VoIP), and fiber solutions. Our investments in research and development over the last two years are now showing returns as we continue to deliver new applications to new customers. As a result, we believe we are gaining momentum and market share in our target access segments.*

"The third quarter was particularly significant for us in the wireless market. We believe that our success is due to a continuing wireless carrier focus on cell site efficiency, improving remote management, upgrading sites for E911 compliance, and providing packetized traffic for 3G migration. In June of 2002, we introduced the Axxius(TM) 800 platform as part of our market diversification strategy and we are now recognizing the benefits of that investment with 28% of our Q3 revenue generated from sales to the wireless market. We intend to continue our development efforts in this area

to enable wireless carrier customers to migrate to new packet-based solutions for even greater operational efficiencies.

"In addition to gaining momentum in the wireless market, earlier this month we announced successful trials and a strategic partnership for fiber-to-the-premises (FTTP) deployments. Our product development of the Exxtenz(TM) Business Optical Network Terminal (B-ONT) began to pay off as well as in the third quarter as we recognized our first meaningful revenue for this new access technology. We are clearly delivering results on our investment in packetized access technologies that are designed to lower the cost of delivering new broadband services to businesses and end users. During the third quarter, we added new features to our Adit(R) 600 platform, and successfully trialed new VoIP features for international customers. We are seeing increased demand for our Adit 600 platform both for traditional voice deployments and for VoIP applications. We are extremely encouraged by our customers' adoption of the Adit 600 platform.

(Emphasis added.)

27.    On November 14, 2003 Carrier Access filed its quarterly report for third quarter 2003 with the SEC on Form 10-Q.  It was signed by Defendant Anderson.  The Company's Form 10-Q reaffirmed the Company's previously announced financial results for the third quarter 2003.  Also, in the Form 10-Q the Company represented that its internal controls were "effective."   In addition, Defendants Koenig and Anderson certified:

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

28.     The Defendants statements regarding the Company's 3Q03 financial results and business condition were materially false and misleading when made, or omitted material facts necessary to make the statements not false or misleading. Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     During 3Q03 the defendants improperly managed earnings through various accounting manipulations in violation of GAAP which allowed them to meet or exceed security analysts' expectations including:

(i)      improperly recoding revenue for shipments of product for which Carrier had passed neither title nor risk of loss to the customers, resulting in overstatement of the company's net revenue by $1.2 million, of 8.5%; and

(ii)     reducing inventory reserves for products that had been previously determined to be unsellable, and upon sale of the written-down inventory, improperly writing it back up, resulting in understatement of the company's cost of sales and overstatement of net income by $229,000, or 48.4%;

(b)     the Company lacked adequate internal controls; and

(c)     as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP.

29.     Defendants' false and misleading statements and omissions had a direct effect on the price of Carrier's stock price, which increased to over $7.70 per share between October 21, 2003 and November 14, 2003, and continued to trade at artificially inflated prices.

30.     Notwithstanding their knowledge that the statements regarding the Company's 3Q03 financial results were false and misleading, between October 21, 2003 and November 26, 2003, Defendants Koenig and Pierce each sold 43, 500 shares of Carrier stock for unlawful insider trading proceeds exceeding $975,000.

31.     On November 25, 2003, with the Company's shares further inflated by the Individual Defendants' false statements, Carrier Access acquired the company Paragon using Carrier Access' own shares as currency.  The acquisition of Paragon enhanced Carrier's product portfolio with the "MASTERseries" and "BROADway" transport devices, purportedly raising the Company to a "leadership position" in the wireless data transport market.  Notably, Defendants held the Paragon acquisition out to the market as a vehicle to diversify Carrier's wireless service provider and Original Equipment Manufacturer ("OEM") customer base in the face of increased wireless provider market consolidation.  The Company issued a press release "Carrier Access Completes Acquisition of Paragon Networks" disclosing the terms of transaction:

> Carrier Access Corporation, a leading provider of broadband access and service delivery platforms for both wireline and wireless communications carriers, today announced the completion of its acquisition of Paragon Networks International Inc. Under the terms of the transaction, Carrier Access issued approximately 1,334,521 shares of common stock and paid approximately $411,407 in cash for all outstanding shares of Paragon capital stock. The combined company will be headquartered in Boulder, Colorado.

32.     On January 20, 2004, the Company issued a press release entitled "Carrier Access Reports Fourth Quarter and 2003 Year End Financial Results." The press release stated in part:

Carrier Access Corporation, a manufacturer of broadband communications equipment, today reported results for its fourth quarter and year ended December 31, 2003.

Revenue for the fourth quarter of fiscal 2003 was $23.3 million compared with $15.9 million for the third quarter of fiscal 2003 and $11.5 million for the fourth quarter of fiscal 2002. Net income for the fourth quarter of fiscal 2003 was $1.5 million or $0.05 per diluted share compared with net income for the third quarter of fiscal 2003 of $702,000 or $0.03 per diluted share and a net loss of $8.0 million or $0.32 per diluted share for the fourth quarter of fiscal 2002.

Revenue for the year 2003 was $62.6 million compared with $50.2 million for the year of 2002. Net income for the year of 2003 was $2.5 million or $0.09 per diluted share, compared with a net loss for the year of 2002 of $52.7 million or $2.13 per diluted share.

*"The fourth quarter* was *an excellent quarter for Carrier Access as we recorded our fourth consecutive quarter of revenue and net income growth," said Roger Koening, President and CEO of Carrier Access. "Our fourth quarter results showed a 46% gain in revenue to $23.3 million over $15.9 reported in the third quarter. This revenue increase was primarily driven by our wireless customer deployments."*

*"We believe that 2003 was a successful year for Carrier Access. At the beginning of the year our focus was to increase revenues and return to profitability during the year. Our approach for achieving this goal was to diversify our customer base, focus our sales and marketing efforts on wireless and other new markets, and introduce new products, while controlling our expenses. We believe that our 2003 results clearly demonstrate that we achieved this goal - as we ended the year profitably with revenue growth of 24.5% over 2002."*

(Emphasis added.)

33.    On January 30, 2004, the Company issued a press release entitled

"Carrier Access Announces Public Offering of 6,000,000 Shares of Common Stock."

The press release stated in part:

Carrier Access announced today the public offering of 6,000,000 shares of common stock at a price of $12.25 per share.

> The managing underwriters of the offering were Credit Suisse First Boston LLC, Deutsche Bank Securities Inc. and Needham & Company, Inc. Credit Suisse First Boston LLC served as the sole book runner. The underwriters have an option to purchase up to 900,000 additional shares of common stock from the company solely to cover over-allotments, if any.

34.     In the first quarter 2004, Carrier Access completed a public offering of approximately 6.8 million shares of common stock resulting in net proceeds to the Company of approximately $78.5 million.

35.     On March 30, 2004 Carrier Access filed its annual report for the year ending 2003 with the SEC on Form 10-K.   It was signed by Defendants Anderson, Koenig, Pierce, Laube, Barnett and Floyd.   The Company's Form 10-K reaffirmed the Company's previously announced financial results for the fourth quarter and year ending 2003.   Also, in the Form 10-Q the Company represented that its internal controls were "effective."   In addition, Defendants Koening and Anderson certified:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a)     all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

36.     The Defendants' statements regarding the Company's 4Q03 and FY2003 financial results and business condition were materially false and misleading when made, or omitted material facts necessary to make the statement not false or misleading.   Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     throughout FY2003, the defendants improperly managed earnings through various accounting manipulations in violation of GAAP which allowed them to meet or exceed security analysts' expectations including:

(i)     improperly  recording revenue for shipments of product for which Carrier had passed neither title nor risk of loss to the customer, resulting in overstatement of the Company's net income by $34,000;

(ii)     reducing inventory reserves for products that had been previously determined to be unsellable, and upon sale of the written-down inventory, improperly writing it back up, resulting gin understatement of the Company's cost of sales and overstatement of net income by $912,000; and

(iii)     as a result of defendants'' improper recognition of revenue and inventory reserves, the Company's net income and EPS for FY2003 were materially overstated by 62.6% and 66.7%, respectively;

(b)     the Company lacked adequate internal controls; and

(c)     as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP.

37.     Defendants' false and misleading statements and omission concerning Carrier's 4Q03 and FY2003 financial results had a direct effect on the price of Carrier's stock, which continued to trade at artificially inflated levels above $9.00 per share.

38.     Notwithstanding their knowledge that the statements regarding the Company's 4Q03 and FY2003 financial results and prospects were false and misleading, between December 1, 2003 and February 27, 2004, Defendants Koenig and Pierce each sold a total of 94,500 shares of Carrier stock for unlawful insider trading proceeds exceeding $2.5 million.

39.     On April 20, 2004, the Company issued a press release entitled "Carrier Access Reports First Quarter 2004 Financial Results; Wireless Sales Drive 23% Quarter over Quarter Revenue Growth." The press release stated in part:

> Carrier Access Corporation, a manufacturer of broadband communications equipment, today reported results for its first quarter ended March 31, 2004.
>
> Revenue for the first quarter of 2004 was $28.5 million compared with $23.3 million for the fourth quarter of 2003 and $11.2 million for the first quarter of 2003. Net income for the first quarter of 2004 was $2.7 million, or $0.09 per share, compared with net income for the fourth quarter of 2003 of $1.5 million, or $0.05 per share, and net income of $117,000, or $0.00 per share, for the first quarter of 2003. This marks Carrier Access' fourth consecutive quarter of revenue growth and fifth consecutive quarter of net income growth. In the first quarter of 2004, Carrier Access completed a public offering of approximately 6.8 million shares of common stock, resulting in net proceeds to the Company of approximately $78.5 million. The Company ended the quarter with cash, cash equivalents, and marketable securities available for sale of $118.1 million.
>
> "Q1 was an excellent quarter for Carrier Access as we recorded 23% quarter over quarter revenue growth, and 79% quarter over quarter net income growth," said Roger Koening, president, CEO and chairman of Carrier Access. "We believe our balance sheet strength, 11 years of operating history and technology direction, combined with our incumbent vendor status and extensive sales and distribution channels, give us an advantage for strong, continued success across our three focus markets wireless, broadband and fiber access."

40.     On May 14, 2004 Carrier Access filed its quarterly report for first quarter 2004 with the SEC on Form 10-Q.   It was signed by Defendant Anderson.   The Company's Form 10-Q reaffirmed the Company's previously announced financial results for the first quarter 2004.   Also, the Company represented that its internal controls were "effective."  In addition, Defendants Koenig and Anderson certified:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a)     all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

41.     The Company's 1Q04 Form 10-Q also contained the following risk disclosures:

> •     If we are unable to develop new or enhanced products … we could experience a reduction in our future  product sales, **which would cause the market price of our common stock to decline …** (and)
>
> •     Our success depends on our ability to enhance our existing products and to timely and cost-effectively develop new products.

42.     Defendants' false and misleading statements and omissions concerning Carrier's 1Q04 financial results had a direct effect on the price of Carrier's stock, which continued to trade at artificially inflated levels above $9.00 per share.

43.     Notwithstanding their knowledge that the statements regarding the Company's 1Q04 financial results and prospects were false and misleading, between March 31, 2004 and May 28, 2004, Defendants Koenig, Pierce and Anderson sold a total of 230,000 shares of Carrier stock for unlawful insider trading proceeds exceeding $2.6 million.

44.     On July 20, 2004, the Company issued a press release entitled "Carrier Access Reports Second Quarter 2004 Financial Results; Company Reports Fifth Consecutive Quarter of Revenue Growth." The press release stated in part:

> Carrier Access Corporation, a leading provider of broadband communications technologies, today reported results for its second quarter ended June 30, 2004.
>
> Revenue for the second quarter of 2004 was $30.8 million compared to first quarter 2004 revenue of $28.5 million, an 8% increase. Year over year revenue, including revenue from the Paragon acquisition, increased 152% from the $12.2 million reported for the second quarter of 2003.
>
> Net income for the second quarter of 2004 was $3.6 million, or $0.10 per share, compared with the $2.7 million, or $0.09 per share, reported in the first quarter of 2004, an increase of 32%. Year over year net income increased more than 29 times from the $122,000, or $0.00 cents per share, reported for the second quarter of 2003. This marks the fifth consecutive quarter of revenue growth and eighth consecutive quarter of net income growth for Carrier Access.
>
> Revenue for the first six months of 2004 totaled $59.4 million, compared to $23.4 million for the same period of 2003, an increase of 154%. Net income for the first six months of 2004 was $6.3 million or $0.18 per share, compared with net income for the first six months of fiscal 2003 of $239,000 or $0.01 per share.
>
> *In the second quarter, Carrier Access was added to the Russell 3000 index as part of Russell Investment Group's annual re-evaluation of the closely watched indexes. The Russell 3000*

> *measures the top 3,000 U.S. equities in terms of market capitalization.*
>
> *"The second quarter 2004 was another positive quarter for Carrier Access. Once again we met our financial expectations and gained increased interest from both current and potential customers for our wireless backhaul and VoIP technologies," said Roger Koening, chairman, CEO and president, Carrier Access. "We continue to operate against a solid business plan, and maintain a long-term outlook and commitment to our three focus markets - wireless, broadband and fiber access."*

(Emphasis added.)

45.    Again, Defendants reported "record" growth and earnings for 2Q04, but failed to disclose that Carrier's significant customers', (*i.e.*, T-Mobile and XO Communications), cell sites were saturated and that "FLEXEngine" technology would not be timely delivered to customers in 3Q04.

46.    On July 20, 2004, the Individual Defendants reduced the Company's financial projections, sending the price of the Company's shares down $4.73 to $8.06, a decline of 37%. The following day, *Bloomberg* issued an article entitled "Carrier Access Shares Fall on 3rd Qtr Sales Forecast," which stated in part:

> Shares of Carrier Access Corp., which makes equipment for high-speed wireless Internet connections, had their biggest drop ever, falling 37 percent after the company forecast third-quarter sales will be little changed from second-quarter levels.

47.    In fact, the Company's financial results would be much worse than the *Bloomberg* article suggested and would fail to achieve even the reduced third quarter forecasted results through legitimate means. The Company's prospects for business success and earnings growth for Q3 2003 and beyond were severely diminished. As investors and the market became aware that Carrier Access' actual business prospects

were poorer than represented, which had been obfuscated by the Individual Defendants, the prior artificial inflation continued to evaporate, thereby eroding the Company's share price.

48.     Defendants indicated that the inability to provide 3Q04 guidance was due to a lack of "visibility" of sales:

> **Anderson**:  Due to industry consolidation in the wireless market, it is difficult to give meaningful guidance as wireless service providers are acquiring assets and in the process of consolidating their networks and covered spectrums.  As a result of these events, wireless customers are rationalizing their equipment inventories to determine their near-term spending.
>
> As such, this gives us less visibility in the short term into specific wireless spending …. Looking into the third quarter, we anticipate revenue to be relatively stable compared with the second quarter.
>
> * * *
>
> I believe that next quarter [(3Q04)] you'll see wireless be flat, relatively stable, or maybe drop off some ….
>
> In the last few weeks we've just seen the visibility from a few of our major wireless customers decrease.

49.     This partial disclosure, false and misleading in-and-of-itself, caused Carrier's stock to plunge by more than 37% from $12.79 on July 20, 2004 to $8.06 per share on July 21, 2004 - or exceptionally large volume of 5,780,000 shares- the largest on-day stock drop in Carrier's history as a public company.  They would be unable to provide meaningful guidance for 3Q04, which sent the Company's stock price into a five-day downward spiral, from $12.79 on July 20, 2004 to $6.93 on July 26, 2005.

50.     On August 12, 2004 Carrier Access filed its quarterly report for second quarter 2004 with the SEC on Form 10-Q.  It was signed by Defendant Anderson.  The

Company's Form 10-Q reaffirmed the Company's previously announced financial results for the second quarter 2004. Also, in the Form 10-Q the Company represented that its internal controls were "effective." In addition Defendants Koenig and Anderson certified:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

51. Notwithstanding their knowledge that the statements regarding the Company's 2Q04 financial results and prospects were false and misleading, between June 3, 2004 and July 6, 2004, Defendants Koenig, Pierce and Anderson sold a total of 142,687 shares of Carrier stock for unlawful insider trading proceeds exceeding $1.8 million.

52. Defendant Koenig's and Pierce's insider sales between June 3, 2004 and July 6, 2004 are more suspicious in light of the fact that they did not sell a single share of Carrier stock after the July 21, 2004 37% slide.

53.   On September 8, 2004, the Company issued a press release entitled "Carrier Access Updates Guidance for Third Fiscal Quarter 2004." The press release stated in part:

> Carrier Access Corporation, a leading provider of broadband communications technologies, today announced after discussions with several wireless service providers and OEM customers, and due to industry consolidation in the wireless industry, it expects revenues for the third fiscal quarter of 2004 to decline on a sequential basis by approximately 15 to 20 percent from the $30.8 million recorded in the second fiscal quarter of 2004.
>
> Carrier Access believes discussions with its customers have resulted in increased visibility and anticipates that revenues for the fourth quarter 2004 will increase slightly quarter over quarter from revenues anticipated to be reported in the third quarter. Carrier Access continues to see increased demand for its business service delivery, including Voice-over-IP (VoIP) products and believes the decrease in sales to wireless customers is a short-term event and due principally to the consolidation in the wireless mobility market in North America.
>
> "Consolidation among wireless service providers has resulted in what we believe is a short-term spending decline as wireless service providers constrain their capital to rationalize their networks. This is clearly affecting our top line. Although quarterly revenues are anticipated to decline from those reported in the second quarter of 2004, we believe we are well positioned to increase revenues in 2005 in the wireless market," said Roger Koening, president, CEO and chairman, Carrier Access.
>
> "We remain focused on introducing new products for our Broadband Business Access and Wireless customers and are encouraged by customer engagements and continued trials. We continue to believe we are focused on the highest growth markets and believe we are well positioned to profitably grow our business," Koening said.

54.   On October 19, 2004, the Company issued a press release entitled "Carrier Access Reports Third Quarter 2004 Financial Results." The press release stated in part:

> Carrier Access Corporation, a leading provider of communications access technologies, today reported results for its third quarter ended Sept. 30, 2004.
>
> Revenue for the third quarter of 2004 was $21.6 million compared to third quarter 2003 revenue of $15.9 million. Net loss for the third quarter of 2004 was $3.8 million, or $0.11 per share, compared with the net income of $702,000, or $0.03 per share, reported in the third quarter of 2003. Net loss for third quarter 2004 includes the settlement amount and legal expenses of $2.1 million associated with the settlement of litigation with SMTC Manufacturing Corporation of Colorado as well as $307,000 for amortization of intangible assets related to a previous acquisition, which total $0.07 per share. "As we have previously stated, wireless consolidation and budget changes significantly impacted our third quarter results," said Roger Koening, president, CEO and chairman, Carrier Access. "Although our quarterly revenues were less than we anticipated, we maintain our belief that wireless data upgrades and VoIP access delivery are significant growth areas in the communications industry. As such, we believe that our focus and development within these areas, combined with our strong balance sheet and customer base, puts us in a good position to capitalize on the global migration from circuit to packet-based infrastructure in 2005.
>
> "Throughout the third quarter we remained focused on developing our customer and product base, and delivered on expanding our converged IP access with shipment of the Adit 3000 Series for carrier-grade IP business services. The introduction of the Adit 3000 combined with the delivery of new capacities for our Adit 600 CMG for the conversion of telephone lines to VoIP have allowed us to increase our customer base in this market. During the third quarter we added 12 new customers who are deploying hosted VoIP services," Koening added.

55.   On November 12, 2004 Carrier Access filed its quarterly report for third quarter 2004 with the SEC on Form 10-Q.  It was signed by Defendant Anderson.  The

Company's Form 10-Q reaffirmed the Company's previously announced financial results for the third quarter 2004.  Also, in the Form 10-Q the Company represented that the Company's internal controls were "effective."   In addition Defendants Koenig and Anderson certified:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a)    all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

56.    On November 18, 2004, the Company issued a press release entitled "Carrier Access Announces CFO Resignation; Co-Founder and Board Member Nancy Pierce Appointed Interim CFO." The press release stated in part:

> Carrier Access Corporation, a leading provider of communications access technologies, said Thursday that its chief financial officer (CFO), Timothy R. Anderson, has resigned to pursue another CFO opportunity in Colorado. Nancy Pierce, the Company's co-founder and corporate development officer, will take responsibility as interim CFO, effective immediately. Pierce previously served as CFO for Carrier Access from 1992 through 2000, and managed the Company's initial public offering in July 1998. Pierce will continue as a member of the Carrier Access board and as corporate development officer, while a search is conducted.
>
> Carrier Access chief executive officer and president Roger Koening stated: "Tim brought strong financial management to our business

operations and the company has benefited from his many contributions over the years. We appreciate his dedication to Carrier Access and wish him all the best."

57.     On November 18, 2005 and November 19, 2005, as a result of Carrier announcing Anderson's departure, the Company's stock price slid more than 9%, from $9.80 to $8.85 on heavy composite volume.     Despite Defendants' disclosure concerning the circumstances of Anderson's resignation, which was false and misleading in-and-of-itself, Carrier's stock still traded at artificially inflated levels because the full nature and extent of the Defendants' unlawful accounting manipulations remained undisclosed.

58.     Indeed, on November 18, 2005, Pierce downplayed Anderson's departure and continued to keep secret the truth of defendants' fraud from the market.   The following day, the *Daily Camera* issued an article entitles "Executive Leaves Boulder, Colo.-Based Telecommunications Equipment Firm" which stated in part:

> ***"I'm personally disappointed that Tim's leaving," Pierce said, adding he left on good terms.  "He's a great guy."***
>
> * * *
>
> Carrier Access doesn't anticipate the personnel change will affect any of the federal regulatory filings it's required to make as a public company ***[(Pierce)] said.  Pierce said the timing of Anderson's decision – as Carrier Access' fiscal year comes to a close next month – shouldn't suggest any problems with the company's accounting.***
>
> ***"There's nothing like that here at all."***

59.     However, Anderson has publicly disclosed in a lawsuit against Koenig and Pierce that he left the Company in large part because of: (a) Carriers' recognition of the $4.0 million Verizon equipment transaction in 4Q04 would be a blatant violation of

GAAP; (b) Pierce's workplace conduct, which Anderson has publicly claimed to be "lewd and lascivious," and (c) Pierce holding "strong ill-will" towards Anderson as a result of Anderson's repeated complaints about Pierce's over and inappropriate sexual behavior in the workplace.

60.    On November 30, 2004 twelve days after his departure from Carrier, Anderson unloaded over 80,000 share of his Carrier stock for nearly $750,000 in ill-gotten proceeds, knowing or recklessly disregarding that Carrier's FY2003 and FY2004 financials were false and misleading.

61.    Defendants' false and misleading statements and omissions concerning Carrier's financial results had a direct effect on the price of Carrier's stock price, which continued to trade at artificially inflated levels above $9.00 per share.

62.    On January 25, 2005, the Company issued a press release entitled "Carrier Access Reports Fourth Quarter and 2004 Year-End Financial Results." The press release stated in part:

> Carrier Access Corporation, a manufacturer of broadband communications equipment, today reported results for its fourth quarter and year ended December 31, 2004.
>
> Revenue for the fourth quarter of fiscal 2004 was $20.4 million compared with $23.3 million for the fourth quarter of fiscal 2003. Net loss for the fourth quarter of fiscal 2004 was $1.5 million or $0.04 per diluted share compared with net income for the fourth quarter of fiscal 2003 of $1.5 million or $0.05 per diluted share.
>
> Revenue for the year 2004 was $101.4 million compared with $62.6 million for the year of 2003. Net income for the year of 2004 was $946,000 or $0.03 per diluted share compared with $2.5 million or $0.09 per diluted share for the year of 2003.

Results for the fourth quarter 2004 reflect a charge of $504,000 in COGS related to the write off of inventory from the Paragon acquisition that was completed in November of 2003. Carrier Access Chairman and Chief Executive Officer Roger Koenig stated, "Fiscal 2004 was a successful year for Carrier Access. At the beginning of the year our focus was to increase revenues profitably during the year. We increased year over year revenues by 62%. The largest portion of this increase was due to continued wireless customer acceptance and implementation of our Radio Access Network (RAN) platforms. We believe that our investments in research and development on new platform additions to economically converge broadband data with voice services in wireless access networks will drive continued market success in 2005."

Koenig further stated: "Our broadband business market delivered both growth and significant change during 2004. We delivered our Adit VoIP access products to a significant number of new service provider customers. There were many new Hosted VoIP service launches during 2004 and we clearly see an industry trend of converged IP service access for businesses beginning to replace traditional telephone lines and services. In late 2004, Carrier Access announced and began shipments of our new Adit 3K series products designed to economically enable carrier-grade quality and security for the delivery of new LP services to business users. We have a positive outlook on the growth of the new Hosted VoIP service offerings and our ability to supply specialized equipment and software to access these services during 2005."

63.    On March 22, 2005 Carrier Access filed its annual report for the year ending 2004 with the SEC on Form 10-K.  It was signed by Defendants Koenig, Pierce, Laube, Barnett, Floyd and Lamming.   The Company's Form 10-K reaffirmed the Company's previously announced financial results for the fourth quarter and year ending 2004.   In addition the Company disclosed that its internal controls were **not** "effective."

64.     On April 11, 2005, Koenig announced disappointing financial results for Carrier for 1Q05.   The *Associated Press Newswire* entitled "Carrier Access sees 1Q Sales Below Views," stated in part:

> "Although we did not provide specific first quarter 2005 guidance, our revenue was under our expectations for the quarter," President, CEO and Chairman Roger Koenig said in a statement.   "Our revenue in the first quarter was negatively impacted by lower than anticipated sales in our converged access business and by lower than expected orders and constrained budgets within our major wireless customers."

65.     Again, investors were stunned by yet another Carrier revenue miss.   On the same day, as a result of Koenig's announcement, the Company's tock price fell $0.25, or 4.1%, to close at $5.86 on heavy volume on NASDAQ, then fell $0.61, or 10.4%, to $5.25 in after-hours trading.   Despite defendants' disclosure that Carrier was unable to provide 1Q05 revenue and earnings guidance, which was false and misleading in-and-of-itself, Carrier's stock still traded at artificially inflated levels because the full nature and extent of the defendants' unlawful accounting manipulations, customer saturation and "FLEXEngine" produce delivery failures remained undisclosed.

66.     During the winter/spring of 2005, the Company was having difficulties justifying the accounting entries associated with its previously field FY2004 Form 10-K. Defendant Anderson had fled in November, 2004, just for this reason – he did not want to sign or certify the company's false Form 10-K.   The Company's May 5, 2005, press release would suggest that others did not want to sign it either.

67.   On May 5, 2005, the Company issued a press release entitled "Carrier Access Receives Expected Nasdaq Deficiency Notice Related to Late Filing for Its Form 10-K."  The press release stated in part:

> Carrier Access Corporation, a manufacturer of broadband communications equipment, today announced that consistent with the information provided on its press release on May 2, 2005, the Company has received a Nasdaq Staff Determination letter.
>
> The letter indicates that although the company filed its Form 10-K for the fiscal year ended December 31, 2004, the filing did not include management's assessment of its internal controls over financial reporting and the associated auditor attestation report (collectively, the "Attestations"). Because the Company has not timely filed an amended Form 10-K, with the Attestations, it is not in compliance with the Nasdaq continued listing requirements set forth in Nasdaq Marketplace Rule 4310(c)(14). As a result of the delinquency, Carrier Access common stock will begin trading under the symbol "CACSE" effective at the opening of business on Friday, May 6, 2005, and its common stock is also subject to delisting from the Nasdaq Stock Market.
>
> Carrier Access intends to request an appeal hearing with the Nasdaq Listing Qualifications Panel within seven days of the date of the Determination letter for continued listing on the Nasdaq National Market. Under Nasdaq Market Place Rules, Carrier Access securities will remain listed on the Nasdaq National Market pending the outcome of the hearing. There can be no assurance that the Panel will grant a request for continued listing.
>
> As announced in its press release on May 2, 2005, Carrier Access remains committed to accurate and transparent financial reporting. The Company is working diligently with its auditors KPMG to complete its 2004 Form 10-K and to fully comply with all requirements for continued listing.

68.   On May 20, 2005, the Company issued a press release entitled "Carrier Access Provides Financial Update and Receives Nasdaq Hearing Date." The press release stated in part:

Carrier Access Corporation, a manufacturer of broadband communications equipment, today provided an update on its previously announced financial review.

*Carrier Access is in the process of performing a detailed review of all significant customer relationships and as part of those reviews is evaluating the propriety of the timing of revenue and cost recognition and other revenue recognition issues. At this point in time, the Company has determined that certain revenues and direct costs have been recorded in incorrect periods. The amounts that have been quantified to date are significant and, as a result, previously issued financial statements for the year ended December 31, 2004, and certain interior periods in each of the years ended December 31, 2004, and 2003, will be restated.*

Carrier Access expects to file an amendment to its 2004 Form 10-K (the "Form 10-K/A") and its Form 10-Q for the first quarter of 2005 as soon as reasonably possible.

Carrier Access announced on May 5, 2005, that the Company received a notice on May 4, 2005, from the staff of The Nasdaq Stock Market which stated that although the company filed its 2004 Form 10-K, the filing did not include management's assessment of its internal controls over financial reporting and the associated auditor attestation report (collectively, the "Attestations"). Therefore, it was not in compliance with the filing requirements for continued listing on Nasdaq as required by Nasdaq Marketplace Rule 4310(c)(14) due to the Company's inability to timely file its Form 10-K/A with the Attestations for the 2004 fiscal year.

The Company appealed the delisting notification to the Nasdaq Listings Qualifications Panel and is currently in the appeals process, which will address the delinquency of both the Form 10-K/A and the Form 10-Q. On May 17, 2005, the Company received a notice of a hearing date from the staff of The Nasdaq Stock Market for the Company's appeal of the Nasdaq Listing Qualifications Staff determination to delist the Company's securities from The Nasdaq National Market.  The hearing will be held on Thursday, June 2, 2005. The Company intends to submit materials and attend the hearing in support of its appeal. There can be no assurance that the Panel will grant a request for continued listing.

Carrier Access' securities will remain listed pending a decision. The Company is continuing to work diligently to complete the previously

> announced detailed review of its financial statements, to comply
> with applicable Nasdaq rules and to cooperate with Nasdaq.

(emphasis added).

69.     Also, on May 20, 2005, the Company filed a Form 8-K with the SEC
announcing its May 20th press release.  In the Form 8-K, the Company also announced
that its financial statements for the year ending December 31, 2004, and certain interim
periods for the years ended December 31, 2004 and 2003 should no longer be relied
upon and will be restated.  The Company explained:

> Management has determined that this action is the result of
> a control deficiency whereby the Company's internal control
> procedures did not require an accounting review of its
> customer contracts to determine whether there are
> contradictory contractual provisions in existing customer
> arrangements that could bear on the appropriate timing of
> revenue recognition, and that this control deficiency
> constitutes a material weakness as of December 31, 2004.
> A material weakness is a control deficiency, or combination
> of control deficiencies, that results in a more than remote
> likelihood that a material misstatement of the annual or
> interim financial statements will not be prevented or
> detected.

70.     On this news, the Company's share price dropped $.69 from $5.30 to
$4.61 per share, a decline of 13%.

71.     As a direct result of Individual Defendants' admissions and the public
revelations regarding the truth about Carrier Access' previous representations and its
actual business prospects going forward, Carrier Access' stock price plummeted 37%,
falling from $12.79 on July 20, 2004 to $8.06 per share on July 21, 2004, a drop of
$4.73 per share. Then on May 20, 2005, further revelations relating to the quality of the
Company's 2003-2004 results and even the quality of the Company's internal controls

caused the shares to fall to $4.60 from $5.30, a drop of an additional $0.70 per share. These drops removed the inflation from Carrier Access's stock price.

72.    As set forth above, prior to the Company's disclosures and with the Company's stock price artificially inflated, Defendants Koenig, Pierce and Anderson sold 561,000 shares of Carrier Access stock for more than $7 million in gross proceeds.

73.    As further direct result of the Defendants' wrongful conduct, the Company has been named as a defendant in numerous securities class action lawsuits and is the subject of an informal SEC investigation.

## CARRIER'S RESTATEMENT

**A.    Carrier Access Restates its Financial Statements for 2003 and 2004**

74.    On August 2, 2005, filed its Amended Form 10-K for the year ending December 31, 2004, on Form 10-K/A.  In the Form 10-K/A, the Company announced its restatement of its 2003 and 2004 financial statements:

**Restatement of Consolidated Financial Statements**

On May 2, 2005, we announced certain issues had been identified relating to the proper timing of revenue recognized from certain customer transactions. Additionally, we announced that in response to the issues identified we were performing a detailed review of our customer relationships including the timing of certain revenue.

 During the course of our detailed review of customer relationships, we determined that the accounting with respect to certain prior period transactions required adjustment. As a result, on May 20, 2005 we announced that, although we were still in the process of performing a detailed review of all significant customer relationships, we had determined that we would restate previously issued financial statements for the year ended December 31, 2004 and certain interim periods in each of the years ended

December 31, 2003 and 2004. We subsequently identified additional adjustments which resulted in our decision to restate the previously issued financial statements for the year ended December 31, 2003. This Form 10-K/A includes restated financial statements and related financial information for the years ended December 31, 2003 and 2004, and restated quarterly information for all the fiscal quarters of 2003 and 2004. The restated financial statements include a number of adjustments that impact previously reported revenue, cost of sales, accounts receivable and inventory reserves. The restated financial statements also include related adjustments to deferred revenue, sales and marketing expense and income taxes and a reallocation of the valuation allowance on deferred income tax assets between the current and non current portions. See the following paragraphs and refer to Note 3 of Notes to Consolidated Financial Statements for more detailed discussions of the restatement.

Material weaknesses in our internal control over financial reporting as of December 31, 2004 have been identified and reported to our audit committee. Please see "Item 9A. Controls and Procedures" below for a description of these matters, and of certain of the measures that we have implemented during 2005 to date, as well as additional steps we plan to take to strengthen our internal control over financial reporting.

Other than our Form 10-K for the year ended December 31, 2004, we do not anticipate amending our previously filed annual reports on Form 10-K or our quarterly reports on Form 10-Q for any prior periods. As such, the consolidated financial statements and related consolidated financial information contained in previously filed reports for the years ended December 31, 2003 and 2004 and for the quarterly reports during 2003 and 2004 should no longer be relied upon.

The net effects of all of the restatement adjustments on the statements of operations and balance sheet accounts are described and presented below as of the dates and for the periods indicated in the tables that follow. The amounts as of and for the years ended December 31, 2003 and 2004 are derived from our audited financial statements, as restated,

which are contained herein. We have amended each item of our Annual Report on Form 10-K for the fiscal year ended December 31, 2004 that has been affected by the restatement.

The following is a summary of issues involved with the restatement:

**Passage of Title**

In the course of preparing our condensed financial statements for the quarter ended March 31, 2005, a transaction was identified whereby the underlying contract indicated that title passage occurred upon delivery to the customer whereas we had historically recognized revenues from this customer and all other customers based on our sales order acknowledgement which stated title passage and risk of loss occurred upon shipment from our facility. We then initiated a detailed review of all significant customer relationships to evaluate whether, historically, there was sufficient evidence to conclude that title and risk of loss had passed to each customer upon shipment. In connection with these detailed reviews, we determined that, for certain customers, the sales order acknowledgements were not sufficient to conclude that title and risk of loss had passed upon shipment. Accordingly, we decided revenue and cost of sales for products shipped to these customers should have been recognized upon delivery in our previously reported financial results. We have restated our previously reported financial results for 2003 and 2004 and for interim periods therein to correct for this issue. In our restated financial statements, revenue recognition for shipments which occurred at the end of calendar quarters has now been delayed until the following quarter.

**Probability of Collection**

During our detailed review of customer relationships we determined that we should not have recognized revenue for transactions with certain distributors where it appeared that

the customer may not have been sufficiently capitalized and their ability to pay is contingent upon their resale of our product. Under accounting principles generally accepted in the U.S., if realization of revenue is contingent upon sell-through it is not appropriate to recognize revenue until sell-through occurs or upon receipt of cash. As we did not have sufficient visibility into these distributors' sales activities, we concluded that all sales to these distributors should have been recorded as revenue upon the receipt of cash. We have restated our previously reported financial results for 2003 and 2004 and for interim periods therein to correct for this issue. We expect that the $4.5 million reduction in 2004 revenue related to this adjustment will be recognized as revenue when we receive cash from the distributors.

**Undelivered Elements**

During our detailed review of customer relationships we determined that certain arrangements contained obligations to provide training, support and other deliverables that had not previously been accounted for as separate elements of the arrangement. Generally accepted accounting principles in the U.S. require accounting for each separate element and that a portion of the arrangement fee be allocated to each of those separable elements using an appropriately methodology. We had not previously allocated any arrangement fee to these other deliverables. We have restated our previously reported financial results for 2003 and 2004 and for interim periods therein to correct for this issue.

**Inventory Valuation**

In the course of assembling the information for the restatement of our consolidated financial statements, it was discovered that we had reduced inventory reserves in situations that we had determined that the products were saleable. Generally accepted accounting principles in the U.S. provide that once inventory has been written down below cost as the close of a fiscal accounting period, it should not be written back up. As a result, we completed a detailed analysis of our reserves activity for each component in inventory. We have restated our previously reported

financial results for 2003 and 2004 and for interim periods therein to correct for this issue.

**Restatement Summary**

The following tables are reconciliations of the statements of operations and balance sheets as previously reported to amounts as restated for the periods indicated, in thousands:

|  | Year Ended December 31, 2003 | Year Ended December 31, 2004 |
|---|---|---|
| **Revenues, as previously reported** | $ 62,556 | $ 101,375 |
| Restatement adjustments: | | |
| Passage of title | (84) | (1,154) |
| Probability of collection | — | (4,514) |
| Undelivered elements | — | (214) |
| Total restatement adjustments | (84) | (5,882) |
| **Revenues, as restated** | $ 62,472 | $ 95,493 |

|  | Year Ended December 31, 2003 | Year Ended December 31, 2004 |
|---|---|---|
| **Net income, as previously reported** | $ 2,458 | $ 899 |
| Restatement adjustments: | | |
| Passage of Title | (34) | (459) |
| Probability of collection | — | (2,170) |
| Undelivered elements | — | (230) |
| inventory valuation | (912) | 181 |
| Total restatement adjustments | (946) | (2,678) |

| | Net income (loss), as restated | | $ | 1,512 | $ | (1,779) |

| | December 31, 2003 | December 31, 2004 |
|---|---|---|
| **Total assets, as previously reported** | $ 107,542 | $ 187,166 |
| Restatement adjustments: | | |
| Accounts receivable | (84) | (5,752) |
| Inventory | 50 | 3,089 |
| Inventory valuation | (912) | (731) |
| Deferred income taxes | 830 | 363 |
| | | |
| Total adjustments | (116) | (3,031) |
| | | |
| **Total assets, as restated** | $ 107,426 | $ 184,135 |
| | | |
| **Total liabilities, as previously reported** | $ 18,148 | $ 15,401 |
| Restatement adjustments: | | |
| Deferred revenue | — | 214 |
| Accrued liabilities | — | 16 |
| D Deferred income taxes | 830 | 363 |
| | | |
| Total adjustments | 830 | 593 |
| | | |
| **Total liabilities, as restated** | $ 18,978 | $ 15,994 |
| | | |
| **Total stockholders' equity, as restated** | $ 88,448 | $ 168,141 |
| | | |
| **Total liabilities and stockholders' equity, as restated** | $ 107,426 | $ 184,135 |

75.     On August 19, 2005, the Company announced that it had received a letter from the NASDAQ staff notifying it that the Company had failed to timely file its Form 10-Q for the quarter ended June 30, 2005.

76.     As a result of Carrier's fraudulent accounting practices, it was required to restate in 2003 and 2004 financial statements.   The fact that Carrier restated its financial statements is an admission that:

(a)     the financial results originally issued during the Relevant Period and its public statements regarding those results were materially false and misleading;

(b)     the financial statements reported during the Relevant Period were incorrect based on information available to defendants at he time the results were originally reported; and

(c)     the financial statements could no longer be relied upon as being accurate.

**B.     CARRIER'S GAAP VIOLATIONS AND RESTATEMENT WERE MATERIAL**

77.     Carrier's financial fraud alleged herein was material.   As an initial matter, Carrier's financial misstatements were clearly material solely from a numerical (quantitative) standpoint because the restatement represents at least $0.9 million and $2.7 million (62.6% and 150.5%) of inflated net income for 2003 and 2004 respectively. Furthermore, EPS was overstated by 66.7% and 160% for in 2003 and 2004 respectively.

78.     However, definitions of materiality area not limited to numbers and amounts – there are qualitative factors as well.   SEC Staff Accounting Bulletin ("SAB") Topic IM, Materiality, summarizes GAAP definitions of materiality.[1]   Among other items, SAB Topic IM says: "A matter is 'material" if there is a substantial likelihood that a

---

[1] SAB Topic IM, Materiality, represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.

reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

79.     SAB Topic IM Further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*        \*        \*

whether the misstatement masks a change in earnings or other trends

whether the misstatement hides a failure to meet analysis' consensus expectations for the enterprise.

\*        \*        \*

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

80.     SAB Topic IM also says that an intentional; misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

81.     Carrier's misstatements, by their own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**C.     Carrier Lacked Adequate Internal Controls**

82.     Defendants were able to scheme Carrier shareholders and inflate Carrier stock prices through accounting improprieties which resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over:

      (a)     Compliance with established Company policies and procedures requiring a review of consolidated statements of cash flows;

      (b)     Effective policies and procedures to evaluate customer arrangements for the appropriate application of revenue recognition criteria;

      (c)     Effective policies and procedures over accounting for inventory reserves; and,

      (d)     Lacked personnel with sufficient technical accounting expertise.

83.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

      (a)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

      (b)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that –

* * *

      (ii)     transactions are recorded as necessary … to permit preparation of financial statements in conformity with [GAAP] ….

15 U.S.C. §78m(b)(2)(A)-(B).

**D.    The Defendant Directors Abdicated their Oversight Responsibilities to the Company**

84.    According to the Company's SEC filings, the Company's restatement resulted directly from the Company's complete, or nearly complete, lack of effective internal controls.  In its Form 10-K/A filed with the SEC on August 2, 2005, the Company made the following disclosures:

## ITEM 9A.CONTROLS AND PROCEDURES

*Evaluation of disclosure controls and procedures.* As of the end of the period covered by this Annual Report on Form 10-K/A, under the supervision of our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and Rule 15d-15(e) under the Securities Exchange Act of 1934. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of the end of the period covered by this Annual Report on Form 10-K/A because of the material weaknesses in internal control over financial reporting discussed below.

A material weakness, as defined under standards established by the Public Company Accounting Oversight Board's (PCAOB) Auditing Standard No. 2, is a control deficiency, or a combination of control deficiencies, that results in a more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected in a timely manner by management or by employees in the normal course of performing their assigned functions.

Management has evaluated the effectiveness of our internal control over financial reporting as of December 31, 2004. Management based its assessment on the criteria established in a report entitled *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its assessment, management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2004, because of the following material weaknesses:

- Management did not comply with our established policies and procedures requiring a review of our consolidated statement of cash flows.  This failure to comply with established policies and procedures resulted in material misstatements in our December 31, 2004 consolidated statement of cash flows. Specifically, there were material misstatements in

cash flows from operating activities and cash flows from investing activities. These misstatements were corrected prior to our original filing of our 2004 Annual Report on Form 10-K.

- We did not have effective policies and procedures to evaluate customer arrangements for the appropriate application of revenue recognition criteria as contemplated by generally accepted accounting principles in the U.S. This deficiency results in material misstatements to our financial statements, specifically the overstatement of revenue, costs of sales, and accounts receivable, and the understatement of inventory in our previously filed consolidated financial statements as of and for the years ended December 31, 2003 and 2004, and for the interim periods contained therein. Accordingly, we have restated such consolidated financial statements to reflect the correction of these errors.

- We did not have effective policies and procedures over accounting for our inventory reserves to prevent the write of inventory once it had been written down in a previous fiscal accounting period. This deficiency resulted in material misstatements of inventory and cost of sales in our previously filed consolidated financial statements as of and for the years ended December 31, 2003 and 2004, and for the interim periods contained therein. Accordingly, we have restated such consolidated financial statements to reflect the correction of these errors.

- We lacked the depth of personnel with sufficient technical accounting expertise to identify and account for complex transactions in accordance with generally accepted accounting principles in the U.S. This deficiency contributed to the aforementioned misstatements and resulted in there being more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected.

- Our independent registered public accounting firm, KPMG LLP, has issued an audit report on

management's assessment of our internal control over financial reporting, which is filed below.

* * *

*Remediation of weaknesses in internal control over financial reporting.* Subsequent to December 31, 2004, we have implemented, or plan to implement, the specific measures described below to remediate the material weaknesses described above.

In respect to the material weakness in the consolidated statement of cash flows discussed in Item 9A(b) above, in 2005, we will require the Chief Financial Officer to monitor the compliance with our established policy which provides for a review of the statement of cash flows by a technically competent individual.

We are in the process of establishing controls to remediate the material weakness in internal controls relating to accounting for revenue recognition. A review by a technically qualified person will be performed on all customer arrangements for the purpose of evaluating the appropriate application of the revenue recognition criteria as contemplated by generally accepted accounting principles in the U.S.

To address the material weakness in controls over accounting for inventory reserves, in 2005, we designed an additional policy which requires a review of reserve activity by a qualified individual.

We are in the process of addressing the material weakness related to the lack of depth of personnel with sufficient technical accounting expertise. In this regard, in 2005, we hired a new Chief Financial Officer and plan to establish a formal process for the periodic technical training of the financial and sales personnel.

The aforementioned material weaknesses will not be considered remediated until new processes are fully implemented, operate for a period of time and are tested and we conclude that they are operating effectively. We anticipate that we will report in our Quarterly Report on

Forms 10-Q for the first and second quarters of 2005 that material weaknesses in our internal control over financial reporting continue to exist and that our disclosure controls and procedures were not effective as of March 31, 2005 and June 30, 2005.

85.     *AU §319.06, Internal Control in a Financial Statement Audit*, defines internal controls as "a process - effected by an entity's board of directors, management, and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

86.     Carrier Access' lack of adequate internal controls rendered its Relevant Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, as detailed above, throughout the Relevant Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

87.     The conduct of Defendants Floyd, Laube, Barnett and Lamming was particularly egregious in that they were members of the Audit Committee during the time period in which the Company's wrongdoing was ongoing.  Defendants Laube, Barnett and Floyd have served as members of the Company's Audit Committee since at least 2002.  Defendant Lamming has served on the Audit Committee since April 2, 2004.

According to the Charter for the Company's Audit Committee, the purpose of the Company's Audit Committee is as follows:

> The purpose of the Audit Committee of the Board of Directors of Carrier Access Corporation (the "Company") shall be to:
>
> - Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
>
> - Assist the Board of Directors in oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements; (3) the independent auditors' qualifications, independence and performance, and (4) the Company's internal accounting and financial controls; and
>
> - Provide to the Board of Directors such information and materials as it may deem necessary to make the board aware of significant financial matters that require the attention of the board.

Further, the Audit Committee's duties include, but are not limited to, the following responsibilities and duties:

> * * *
>
> - Reviewing the reports of management and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management and the independent auditors to review their assessment of the adequacy of such controls, and to review before release the disclosure regarding such system of internal controls required under SEC Rules to be contained in

the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

88.    The Company's Board of Directors and particularly the members of its Audit Committee and its CEO, Koening, wholly abdicated their responsibilities to the Company and its shareholders by failing to implement adequate accounting procedures and internal controls necessary to provide reasonable assurance that the Company's financial statements were issued in accordance with GAAP and that the Company was in compliance with all federal and state laws.

## ILLEGAL INSIDER STOCK SALES

**E.    Defendants Koenig, Pierce and Anderson's Illegal Insider Stock Sales**

89.    During the Relevant Period, with the Company's share price artificially inflated, Defendants Koenig and Pierce, through Keld, a limited liability company owned by Koenig and Pierce, sold 561,000 Carrier Access shares for proceeds of $7,034,165.56.

90.    Koenig and Pierce's trading was timed to profit from the artificial inflation in Carrier's stock price.  Koenig and Pierce sold at an average share price of $12.54 (143% higher than the average trading price of the Company's stock after defendants' fraud was revealed).  Therefore, Koenig's and Pierce's sales were not merely unusual in amount, but also were timed to take advantage of the artificial inflation in the price of Carrier stock that immediately followed their publicly disseminated false and misleading statements concerning Carrier's financial results and condition.

91.    Defendant Anderson personally sold 171,319 shares of Carrier stock for insider trading proceeds exceeding $1.7 million, also benefiting from the artificial inflation in Carrier's stock price.  During the Relevant Period, Anderson sold 77.56% of his Carrier stock holdings.  Anderson's reported insider trading during the Relevant Period is detailed below.

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Timothy R. Anderson | 6/10/2004 | 2.150 | $11.98 | $25.757.00 |
| | 4/29/2004 | 6.000 | $10.978 | $65.868.00 |
| | 5/6/2004 | 6.000 | $10.481 | $62.883.00 |
| | 5/13/2004 | 6.000 | $9.731 | $58.388.00 |
| | 5/20/2004 | 6.000 | $9.057 | $54.343.00 |
| | 5/26/2004 | 20.000 | $10.420 | $208.400.00 |
| | 5/27/2004 | 6.000 | $10.673 | $64.039.00 |
| | 6/3/2004 | 6.000 | $11.500 | $69.000.00 |
| | 6/10/2004 | 2.150 | $11.980 | $25.757.00 |
| | 6/10/2004 | 1.000 | $11.960 | $11.960.00 |
| | 6/10/2004 | 900 | $12.270 | $11.043.00 |
| | 6/10/2004 | 500 | $12.260 | $6.130.00 |
| | 6/10/2004 | 400 | $12.180 | $4.872.00 |
| | 6/10/2004 | 250 | $12.120 | $3.030.00 |
| | 6/10/2004 | 200 | $12.160 | $2.432.00 |
| | 6/10/2004 | 200 | $12.190 | $2.438.00 |
| | 6/10/2004 | 200 | $12.250 | $12.450.00 |
| | 6/10/2004 | 100 | $12.110 | $1.211.00 |
| | 6/10/2004 | 100 | $12.170 | $1.217.00 |
| | 6/17/2004 | 687 | $12.011 | $8.251.00 |
| | 7/2/2004 | 21.500 | $14.000 | $301.000.00 |
| | 7/6/2004 | 3.500 | $14.000 | $49.000.00 |
| | 11/30/2004 | 49.462 | $9.110 | $451.510.00 |
| | 11/30/2004 | 31.594 | $9.000 | $284.346.00 |

|  | | | |
|---|---|---|---|
| | 11/30/2004 | 1.876 | $9.000 | $16.884.00 |
| | 11/30/2004 | 600 | $9.110 | $5.466.00 |
| **TOTAL** | | **171.319** | | **$1.771.918** |
| Keld LLC | 10/21/2003 | 3.000 | $6.01 | $18.030.00 |
| | 10/22/2003 | 600 | $6.41 | $3,846.00 |
| | 10/22/2003 | 3,000 | $6.75 | $20,250.00 |
| | 10/22/2003 | 500 | $6.44 | $3,220.00 |
| | 10/22/2003 | 1,350 | $6.40 | $ 8,640.00 |
| | 10/22/2003 | 3,000 | $7.35 | $ 22,050.00 |
| | 10/22/2003 | 550 | $6.41 | $ 3,526.60 |
| | 10/27/2003 | 300 | $9.93 | $ 2,979.00 |
| | 10/27/2003 | 1,000 | $9.95 | $ 9,950.00 |
| | 10/27/2003 | 400 | $9.37 | $ 3,749.60 |
| | 10/27/2003 | 2,600 | $9.38 | $ 24,388.00 |
| | 10/27/2003 | 700 | $9.85 | $ 6,897.80 |
| | 10/28/2003 | 900 | $9.80 | $ 8,820.00 |
| | 10/28/2003 | 1,100 | $9.82 | $ 10,802.00 |
| | 10/28/2003 | 500 | $9.83 | $ 4,915.00 |
| | 10/29/2003 | 1,300 | $9.50 | $ 12,350.00 |
| | 10/29/2003 | 300 | $9.51 | $ 2,853.00 |
| | 10/29/2003 | 200 | $9.50 | $ 1,900.20 |
| | 10/29/2003 | 700 | $9.51 | $ 6,657.70 |
| | 10/30/2003 | 2,500 | $9.90 | $ 24,750.00 |
| | 10/30/2003 | 900 | $10.35 | $ 9,315.00 |
| | 10/31/2003 | 100 | $10.06 | $ 1,006.00 |
| | 10/31/2003 | 375 | $10.01 | $ 3,753.75 |
| | 10/31/2003 | 1,125 | $10.00 | $ 11,250.00 |
| | 11/3/2003 | 3,000 | $10.40 | $ 31,205.10 |
| | 11/4/2003 | 100 | $11.11 | $ 1,111.00 |
| | 11/4/2003 | 100 | $11.12 | $ 1,112.00 |
| | 11/4/2003 | 2,900 | $10.90 | $ 31,610.00 |
| | 11/4/2003 | 2,800 | $11.10 | $ 31,080.00 |
| | 11/4/2003 | 100 | $10.92 | $ 1,092.00 |
| | 11/5/2003 | 3,000 | $11.50 | $ 34,500.00 |
| | 11/6/2003 | 1,500 | $11.75 | $ 17,625.00 |
| | 11/7/2003 | 1,500 | $12.00 | $ 18,000.00 |
| | 11/10/2003 | 900 | $11.51 | $ 10,359.00 |
| | 11/10/2003 | 400 | $11.51 | $ 4,605.20 |
| | 11/10/2003 | 1,700 | $11.50 | $ 19,550.00 |
| | 11/12/2003 | 2,000 | $11.75 | $ 23,500.00 |
| | 11/12/2003 | 2,500 | $11.60 | $ 29,000.00 |
| | 11/12/2003 | 1,500 | $11.30 | $ 16,950.00 |
| | 11/12/2003 | 1,500 | $11.45 | $ 17,175.00 |
| | 11/13/2003 | 2,000 | $12.00 | $ 24,000.00 |
| | 11/13/2003 | 2,500 | $11.60 | $ 29,000.00 |
| | 11/17/2003 | 3,000 | $12.76 | $ 38,280.00 |

| | | | | |
|---|---|---|---|---|
| 11/18/2003 | 2,000 | $13.00 | $ | 26,000.00 |
| 11/18/2003 | 1,000 | $13.01 | $ | 13,010.00 |
| 11/18/2003 | 3,000 | $13.50 | $ | 40,500.00 |
| 11/19/2003 | 500 | $12.63 | $ | 6,315.00 |
| 11/19/2003 | 200 | $12.62 | $ | 2,524.00 |
| 11/19/2003 | 300 | $13.35 | $ | 4,005.00 |
| 11/20/2003 | 500 | $12.96 | $ | 6,480.00 |
| 11/20/2003 | 600 | $12.90 | $ | 7,740.00 |
| 11/20/2003 | 630 | $13.00 | $ | 8,192.52 |
| 11/20/2003 | 100 | $13.05 | $ | 1,305.00 |
| 11/20/2003 | 400 | $12.98 | $ | 5,192.00 |
| 11/20/2003 | 100 | $12.98 | $ | 1,298.10 |
| 11/20/2003 | 400 | $12.91 | $ | 5,164.00 |
| 11/20/2003 | 500 | $13.03 | $ | 6,515.00 |
| 11/20/2003 | 770 | $13.00 | $ | 10,010.00 |
| 11/20/2003 | 1,000 | $12.80 | $ | 12,800.00 |
| 11/24/2003 | 2,500 | $13.00 | $ | 32,500.00 |
| 11/24/2003 | 2,500 | $13.40 | $ | 33,500.00 |
| 11/25/2003 | 1,672 | $14.50 | $ | 24,244.00 |
| 11/25/2003 | 100 | $14.55 | $ | 1,455.00 |
| 11/25/2003 | 300 | $4.53 | $ | 4,359.00 |
| 11/25/2003 | 328 | $14.51 | $ | 4,759.28 |
| 11/25/2003 | 100 | $14.52 | $ | 1,452.00 |
| 11/25/2003 | 2,500 | $14.80 | $ | 37,000.00 |
| 11/26/2003 | 100 | $14.85 | $ | 1,485.10 |
| 11/26/2003 | 1,900 | $14.75 | $ | 28,025.00 |
| 11/26/2003 | 400 | $14.85 | $ | 5,940.00 |
| 11/26/2003 | 2,000 | $14.80 | $ | 29,600.00 |
| 11/26/2003 | 600 | $14.77 | $ | 8,862.00 |
| 12/1/2003 | 900 | $15.10 | $ | 13,590.00 |
| 12/1/2003 | 100 | $15.06 | $ | 1,506.00 |
| 12/1/2003 | 300 | $15.12 | $ | 4,536.00 |
| 12/1/2003 | 200 | $15.00 | $ | 3,000.00 |
| 12/1/2003 | 100 | $15.07 | $ | 1,507.00 |
| 12/1/2003 | 700 | $15.08 | $ | 1,0556.00 |
| 12/1/2003 | 700 | $15.09 | $ | 10,563.00 |
| 12/2/2003 | 2,500 | $15.50 | $ | 38,750.00 |
| 12/2/2003 | 500 | $15.55 | $ | 7,775.00 |
| 12/4/2003 | 2,500 | $14.50 | $ | 36,250.00 |
| 12/4/2003 | 2,500 | $14.10 | $ | 35,250.00 |
| 12/5/2003 | 400 | $13.29 | $ | 5,316.00 |
| 12/5/2003 | 1,500 | $13.25 | $ | 19,875.00 |
| 12/5/2003 | 2,100 | $13.20 | $ | 27,720.00 |
| 12/8/2003 | 100 | $13.42 | $ | 1,342.00 |
| 12/8/2003 | 500 | $13.41 | $ | 6,705.00 |
| 12/8/2003 | 78 | $13.40 | $ | 1,045.20 |
| 12/8/2003 | 100 | $13.45 | $ | 1,345.00 |
| 12/8/2003 | 1,722 | $13.43 | $ | 23,126.46 |

| Date | Quantity | Price | Amount |
|---|---|---|---|
| 12/8/2003 | 500 | $1346 | $ 6,730.00 |
| 12/9/2003 | 100 | $13.57 | $ 1,357.00 |
| 12/9/2003 | 100 | $13.84 | $ 1,384.00 |
| 12/9/2003 | 200 | $13.83 | $ 2,766.00 |
| 12/9/2003 | 1,500 | $13.81 | $ 20,715.00 |
| 12/9/2003 | 1,100 | $13.75 | $ 15,125.00 |
| 12/11/2003 | 1,500 | $12.70 | $ 19,050.00 |
| 12/11/2003 | 1,500 | $12.30 | $ 18,450.00 |
| 12/11/2003 | 1,500 | $11.90 | $ 17,850.00 |
| 12/11/2003 | 1,500 | $11.50 | $ 17,250.00 |
| 12/12/2003 | 2,700 | $12.80 | $ 34,560.00 |
| 12/12/2003 | 100 | $12.80 | $ 1,280.40 |
| 12/12/2003 | 200 | $12.80 | $ 2,560.00 |
| 12/16/2003 | 2,500 | $11.80 | $ 29,500.00 |
| 12/17/2003 | 1,400 | $11.40 | $ 15,960.00 |
| 12/17/2003 | 1,100 | $11.33 | $ 12,463.00 |
| 12/18/2003 | 2,500 | $12.45 | $ 31,125.00 |
| 12/18/2003 | 2,500 | $12.25 | $ 30,625.00 |
| 12/19/2003 | 2,400 | $12.50 | $ 30,000.00 |
| 12/19/2003 | 100 | $12.41 | $ 1,241.00 |
| 12/19/2003 | 300 | $12.40 | $ 3,720.00 |
| 12/19/2003 | 200 | $12.60 | $ 2,520.00 |
| 12/19/2003 | 1,000 | $12.59 | $ 12,590.00 |
| 12/19/2003 | 100 | $12.51 | $ 1,251.00 |
| 12/19/2003 | 400 | $12.66 | $ 5,064.00 |
| 12/19/2003 | 400 | $12.65 | $ 5,060.00 |
| 12/19/2003 | 100 | $12.64 | $ 1,264.00 |
| 12/22/2003 | 400 | $11.96 | $ 4,784.40 |
| 12/22/2003 | 700 | $11.96 | $ 8,372.00 |
| 12/22/2003 | 200 | $11.95 | $ 2,390.00 |
| 12/22/2003 | 1,200 | $12.07 | $ 14,484.00 |
| 12/22/2003 | 1,300 | $12.05 | $ 15,665.00 |
| 12/23/2003 | 600 | $12.12 | $ 7,274.40 |
| 12/23/2003 | 300 | $2.18 | $ 3,654.00 |
| 12/23/2003 | 455 | $12.20 | $ 5,551.00 |
| 12/23/2003 | 3,000 | $12.10 | $ 36,300.00 |
| 12/23/2003 | 945 | $12.11 | $ 11,443.95 |
| 12/23/2003 | 600 | $12.12 | $ 7,272.00 |
| 12/23/2003 | 300 | $12.24 | $ 3,672.00 |
| 12/24/2003 | 300 | $12.10 | $ 3,630.00 |
| 12/24/2003 | 900 | $12.15 | $ 10,935.00 |
| 12/24/2003 | 1,300 | $12.16 | $ 15,808.00 |
| 12/242003 | 2,500 | $12.30 | $ 30,750.00 |
| 12/29/2003 | 5,000 | $12.20 | $ 61,013.00 |
| 12/30/2003 | 5,000 | $12.51 | $ 62,566.50 |
| 12/31/2003 | 5,000 | $12.44 | $ 62,221.00 |
| 1/5/2004 | 3,000 | $14.13 | $ 42,384.30 |
| 1/6/2004 | 3,000 | $14.25 | $ 42,750.00 |

| Date | Shares | Price | Amount |
|---|---|---|---|
| 1/7/2004 | 3,000 | $14.75 | $ 44,243.10 |
| 1/8/2004 | 3,000 | $15.14 | $ 45,413.10 |
| 1/9/2004 | 3,000 | $15.11 | $ 45,319.80 |
| 1/12/2004 | 3,000 | $15.29 | $ 45,879.00 |
| 1/13/2004 | 3,000 | $16.50 | $ 49,500.00 |
| 1/13/2004 | 3,000 | $15.50 | $ 46,500.00 |
| 1/14/2004 | 3,000 | $16.18 | $ 48,528.90 |
| 1/15/2004 | 3,000 | $16.02 | $ 48,063.90 |
| 1/20/2004 | 3,000 | $17.75 | $ 53,250.00 |
| 1/21/2004 | 3,000 | $15.00 | $ 45,000.00 |
| 1/22/2004 | 4,500 | $14.68 | $ 66,059.55 |
| 1/23/2004 | 4,500 | $14.96 | $ 67,199.85 |
| 1/26/2004 | 3,000 | $14.78 | $ 44,337.00 |
| 1/27/2004 | 3,000 | $15.04 | $ 45,132.00 |
| 1/28/2004 | 3,000 | $14.11 | $ 42,318.90 |
| 2/2/2004 | 3,000 | $13.04 | $ 39,120.00 |
| 2/3/2004 | 3,000 | $13.04 | $ 39,117.90 |
| 2/4/2004 | 3,000 | $13.03 | $ 39,086.40 |
| 2/5/2004 | 3,000 | $13.09 | $ 39,260.40 |
| 2/6/2004 | 3,000 | $13.21 | $ 39,641.40 |
| 2/9/2004 | 3,000 | $14.14 | $ 42,410.10 |
| 2/10/2004 | 3,000 | $14.08 | $ 42,242.70 |
| 2/11/2004 | 3,000 | $14.04 | $ 42,109.50 |
| 2/12/2004 | 3,000 | $13.30 | $ 39,885.90 |
| 2/132004 | 3,000 | $13.00 | $ 39,000.00 |
| 2/17/2004 | 3,000 | $12.40 | $ 37,203.00 |
| 2/18/2004 | 4,000 | $12.52 | $ 50,092.40 |
| 2/19/2004 | 4,000 | $12.61 | $ 50,440.00 |
| 2/20/2004 | 4,000 | $11.00 | $ 44,000.00 |
| 2/23/2004 | 3,000 | $11.75 | $ 35,250.00 |
| 2/24/2004 | 3,000 | $10.32 | $ 30,960.00 |
| 2/25/2004 | 3,000 | $10.35 | $ 31,050.00 |
| 2/26/2004 | 3,000 | $10.36 | $ 31,080.00 |
| 2/27/2004 | 3,000 | $11.20 | $ 33,600.00 |
| 3/31/2004 | 60,000 | $12.50 | $750,000.00 |
| 4/2/2004 | 15,000 | $12.62 | $189,300.00 |
| 4/5/2004 | 30,000 | $12.83 | $384,900.00 |
| 4/13/2004 | 15,000 | $12.50 | $187,500.00 |
| 6/24/2004 | 30,000 | $12.51 | $375,300.00 |
| 6/25/2004 | 15,000 | $12.62 | $189,300.00 |
| 7/1/2004 | 30,000 | $12.80 | $384,000.00 |
| 7/2/2004 | 15,000 | $13.86 | $207,900.00 |
| 7/6/2004 | 15,000 | $14.30 | $214,500.00 |
| **Total** | **561,000** | | **$7,034,165.56** |

92.     Like Koenig and Pierce, Anderson timed his trades well, selling his stock at an average price of $10.34 per share (100.4% higher than the average post-Relevant Period trading price of Carrier Stock).   Anderson's trades were highly suspicious in comparison to his trading history.   Before his first Relevant Period sale on April 29, 2004, Anderson had not sold Carrier stock in almost four years.   In addition, Anderson affected 51.1% of his insider sales in the four months leading up to Carrier's July 21, 2004 stock price slide.

93.     All told, the Individual Defendants sold 732,319 shares of Carrier stock at artificially inflated prices for a total of $8,806.105 in unlawful proceeds.   The highly suspicious amount and timing of the Individual Defendants' insider trading supports a strong inference that they were trading with knowledge of the fraud alleged herein and sought to capture the stock's inflated value before the market could absorb the true information regarding the Company's financial results and prospects.

94.     On July 18, 2006, the Honorable Lewis T. Babcock of the United States District Court for the District of Colorado denied Defendants' Motion to Dismiss the securities class action lawsuit styled, *Crocker v. Carrier Access Corporation, et al.*, Case No. 05-cv-01011-LTB-OES filed against defendant Carrier and individual defendants Koenig, Pierce and Anderson.   Specifically, the Court's Order (the "Order") denied defendants' motion to dismiss and found that plaintiffs' successfully stated claims for violations of Section 10(b) of the Exchange Act and Rule 10(b)(5) against defendants Koenig, Pierce and Anderson and Carrier Access.   Plaintiffs also successfully pled violations of federal securities law Section 20(a) in that Koenig and

Pierce controlled and exercised authority over those who made decisions to overstate earnings and that they violated Section 20A of the Exchange Act by participating in contemporaneous insider trading.

95.     More specifically within the Court's Order, the Court held that "[d]efendants are pummeling a straw man" and that  "…a jury could find that the defendants had a duty to make a full and truthful disclosure of the facts, allegedly known to Mr. Koenig in April, 2004, that the market for Carrier's then-existing products were exhausted and that the new product, FLEXEngine, would not be ready in time for its promised delivery."  The Court also noted that Mr. Koening was Carrier's CEO, and the only fair and reasonable inference is that he knew the status of the development of the one product on which Carrier's future profitability depended.  Further, the Court also held in denying defendants' motion to dismiss that the fact of the magnitude of the Company's misstatement and the positions of authority that Mr. Koening and Ms. Pierce occupied within the Company coupled with the motive and opportunity that they enjoyed, and the Sarbanes-Oxley certificates that they signed, gave rise to a strong inference of scientor.

## DEMAND IMPROPERLY DENIED ALLEGATIONS

96.     Plaintiff brings this action derivatively in the right and benefit of Carrier Access to redress injuries suffered and to be suffered by Carrier Access as a result of the breaches of fiduciary duty by the Individual Defendants.

97.     Plaintiff will adequately and fairly represent the interests of Carrier Access and its shareholders in enforcing and prosecuting its rights.

98.     Plaintiff is the owner of Carrier Access common stock and was an owner of Carrier Access at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

99.     Plaintiff, through counsel, made demand on Carrier Access' Board to investigate these and other issues, on December 6, 2006.  *See* Exhibit A, incorporated herein.

100.    Instead of responding to Plaintiff's shareholder demand, on January 10, 2007, the Company and Board's counsel sent to Plaintiff's counsel the Board's response related to the shareholder demand made by another shareholder, James Kenney.  *See*, Exhibit B, incorporated herein.   Further, instead of contacting Plaintiff, a committed shareholder, for meaningful input, the Board instead chose to attempt contacting with Mr. Kenney's counsel who did not return any calls to the Directors' counsel and who also never sought to have input in the Board's consideration of these events.  In fact, the Board did not respond to Plaintiff's specific demand nor at any time did the Board's counsel attempt to contact Plaintiff or his counsel.

101.    On January 15, 2007, Plaintiff's Counsel responded to the Company's counsel's response to Mr. Kenney's demand.  *See*, Exhibit C, incorporated herein.  As evidenced within the letter, the directors did not attempt to contact Plaintiff or its counsel even though the directors were aware of Plaintiff's continued interest in this litigation. The Company's secretary's certification does not even reference the fact that Plaintiff served a demand on the Board.  These facts clearly illustrate a failure by the alleged independent directors to conduct a meaningful investigation.

102.   At the time demand was made, the Board consisted of seven members: Defendants Koenig, Pierce, Barnett, Laude, Floyd, Lord and Fleming.   All of these individuals have been named as Defendants herein.   The refusal to acknowledge Plaintiff's demand on Carrier Access' Board or seek input from Plaintiff, particularly in light of the Order and damage suffered by the Company, evidences a lack of a good faith exercise of its business judgment.

103.   Carrier Access has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

a.   Costs incurred to carry out internal investigations, including accounting fees and legal fees paid to outside counsel and experts; and

b.   Costs and legal fees for defending Carrier Access and the Individual Director Defendants against securities class action litigation arising from illegal and improper conduct alleged herein.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

104.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

105.   The Individual Defendants owed and owe Carrier Access fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Carrier Access the highest obligation of good faith, fair dealing, loyalty and due care.

106.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

107.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.   Moreover, the Individual Defendants completely abdicated their fiduciary duties to the Company by failing to implement internal financial controls that would have prevented the wrongdoing alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

108.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Carrier Access has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

109.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

110.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Carrier Access, for which they are legally responsible.

111.   As a direct and proximate result of the Individual Defendants' abuse of control, Carrier Access has sustained significant damages.

112.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

113.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

114.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Carrier Access in a manner consistent with the operations of a publicly held corporation.

115.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Carrier Access has sustained significant damages in excess of millions of dollars.

116.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

117.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

118.   As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Carrier Access to waste valuable corporate assets by paying bonuses to certain of its executive officers and exposing the Company to potentially millions of dollars of legal liability and/or legal costs to defend the Director Defendants' unlawful actions.

119.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### Against The Individual Defendants
### for Unjust Enrichment

120.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

121.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Carrier Access.

122.   Plaintiff, as a shareholder and representative of Carrier Access, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and breaches of fiduciary duties.

### SIXTH CAUSE OF ACTION

**Against Defendants Koenig, Pierce and Anderson
for Breach of Fiduciary Duties for Insider Selling
and for Misappropriation of Information**

123.   Plaintiff incorporates by reference and reallege each and every allegation set forth above, as if set forth fully herein.

124.   At the time of the stock sales set forth herein by Defendants Koenig, Pierce and Anderson, they knew the information described herein and sold Carrier Access common stock on the basis of such information.

125.   The information described herein was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Defendants Koenig, Pierce and Anderson used for their own benefit when they sold Carrier Access common stock.

126.   Defendants Koenig, Pierce and Anderson's sale of Carrier Access common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

127.   Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Koenig, Pierce and Anderson's fiduciary duties, the Company is entitled to the imposition of a constructive trust for any profits Defendants Koenig, Pierce and Anderson obtained thereby.

## SEVENTH CAUSE OF ACTION

**Against Defendants Koenig, Pierce and Anderson,**
**Pursuant to 15 U.S.C. §7243 (SARBANES-OXLEY ACT)**

128.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

129.   Based upon the allegations made above, and pursuant to 15 U.S.C. §7243, Carrier Access is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation paid to Defendants Koenig, Pierce and Anderson, as well as any profits realized from the sale of Carrier Access securities by them.

130.   Defendants Koenig, Anderson and Pierce are also liable for reasonable costs and attorneys fees incurred in the prosecution of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, including attorney fees, accounting fees, investigation expenses and other costs and expenses incurred in connection with the Company's restatement, the SEC investigation and the securities class action lawsuits;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual

and Director Defendants' and Defendant Keld's trading activities or their other assets so as to ensure that Plaintiffs have an effective remedy;

C.      Declaring that Defendants Koenig, Anderson and Pierce are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse Carrier Access for all bonuses or other incentive-based compensation received by them during 2003 through 2004;

D.      Awarding to Carrier Access restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Individual and Director Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury.

DATED: March 7, 2007

Respectfully Submitted,

<u>s/ Renée B. Taylor</u>
Renée B. Taylor
BADER & ASSOCIATES, LLC
14425 E. Evans Ave., Suite 200
Denver, CO  80014
Phone:  (303) 534-1700
Fax:  (303) 534-1701

William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK  73120

Phone:  (405) 235-1560
Fax:  (405) 239-2112
*wfederman@aol.com*

- and –

2926 Maple Avenue, Suite 200
Dallas, TX  75201

Counsel for Plaintiff

<u>Address of Plaintiff</u>:

500 108th Avenue NE,  8th Floor
Bellevue, WA  98004